Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| HAITHAM SAEED, derivatively on behalf of INOGEN, INC. | |
| Plaintiff, | Case No.: |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| SCOTT WILKINSON, ALISON BAUERLEIN, BENJAMIN ANDERSON-RAY, SCOTT BEARDSLEY, R. SCOTT GREER, RAYMOND HUGGENBERGER, HEATH LUKATCH, LOREN MCFARLAND, and HEATHER RIDER, | |
| Defendants, | **DEMAND FOR JURY TRIAL** |
| and | |
| INOGEN, INC., | |
| Nominal Defendant. | |

## INTRODUCTION

Plaintiff Haitham Saeed ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Inogen, Inc. ("Inogen" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Scott Wilkinson, Alison Bauerlein, Benjamin Anderson-Ray, Scott Beardsley, R. Scott Greer, Raymond Huggenberger, Heath Lukatch, Loren McFarland, and Heather Rider (collectively, the "Individual Defendants," and together with Inogen, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Inogen, unjust enrichment, waste of corporate assets, and violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, he alleges the following based upon personal knowledge as to his and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Inogen, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Inogen's directors and officers from November 8, 2017 through the present (the "Relevant Period").

2.    Inogen is a medical technology company that primarily designs, manufactures, and sells portable oxygen concentrators, and in 2017 it purported to be "the leading worldwide manufacturer of portable oxygen concentrators." The company prides itself on serving patients with respiratory diseases such as emphysema, chronic bronchitis, and especially chronic obstructive pulmonary disease ("COPD").

3.    As a provider of oxygen therapy, Inogen distinguishes itself from other U.S. providers with its 'direct-to-consumer strategy,' marketing itself directly to patients rather than to their physicians. The Company also conducts 'business-to-business' transactions domestically, selling its oxygen concentrators to home medical equipment ("HME") companies that then provide oxygen therapy to patients.

4.    Inogen also serves markets in Canada, Latin America, the Middle East, Africa, and the Asia-Pacific region, though it does not adopt the aforementioned 'direct-to-consumer strategy' abroad.

5.    From 2014 through the beginning of the Relevant Period, Inogen was a high-growth company with consistently strong sales.

6.    Throughout the Relevant Period, the Individual Defendants purported that the Company's strong sales figures were in large part due to the effectiveness and diligence of the Company's workforce. In reality, the Company made use of high-pressure, boiler-room call centers, in which Company employees were instructed to use fraudulent and predatory sales practices in order to hawk the Company's products to the Company's particularly vulnerable customer base. These practices included convincing prospective customers to pay out-of-pocket for the Company's portable oxygen concentrators, instead of using private insurance or Medicare coverage, which the Company's customers were typically eligible for.

7.    During the Relevant Period, the Individual Defendants also caused the Company to greatly exaggerate the total accessible market ("TAM") for the Company's products, as well as the available opportunities for the Company's growth.

8.     Inogen released its financial results for its third quarter of the fiscal year ended September 30, 2018 on November 6, 2018, after the close of trading. Despite generally favorable reports, the Company disclosed that sales growth for its domestic business-to-business sector had sharply declined to 32% from 56% in the second quarter of 2018. Inogen also modified its adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") from $65–69 million to $60–62 million for its fiscal year ended December 31, 2018.

9.     On this news, the price per share of Inogen stock plummeted over 19% from its November 6, 2018 closing price of $193.30, dropping $37.44 to close at $155.86 per share on November 7, 2018.

10.    On February 8, 2019, Muddy Waters Research ("Muddy Waters"), a due diligence-based accounting firm, released a report attacking the Company's TAM and growth projections as baseless and blatantly unrealistic. The report detailed that Inogen had, *inter alia*, based its projections on a substandard report by WinterGreen Research, cherry-picked the Medicare statistics upon which to base its TAM projections, overlooked the medical and financial realities of Medicare coverage for oxygen therapy, and failed to account for the losses of direct-to-customer revenue that resulted from business-to-business growth.

11.    Following this news, Inogen's stock price fell $3.02 per share, from a close of $139.74 on February 7, 2019 to close at $136.72 per share on February 8, 2019.

12.    On February 12, 2019, Citron Research ("Citron"), an investment newsletter, released a report of its own. Therein, Citron exposed Inogen's suspect reseller network and its practice of convincing customers of the false necessity to purchase overpriced products. Specifically, many direct-to-consumer salespeople had made fraudulent sales and artificially inflated the Company's overall direct-to-consumer sales by telling aging, vulnerable patients that Inogen's competitors' products were not covered by Medicare.

13.     Following Citron's report, Inogen's stock price dropped by over $4.00 per share, from a close of $142.09 on February 11, 2019 to close at $138.05 per share on February 12, 2019.

14.      After the market closed on February 26, 2019, the Company issued a press release disclosing its financial results for both the fourth quarter and fiscal year ended December 31, 2018. The same day, Inogen held a conference call with analysts and investors. During the call, Defendant Scott Wilkinson ("Wilkinson"), citing poor business-to-business domestic sales, backed off from Inogen's previous, ambitious TAM estimate of 2.5–3 million patients. He laid the blame for the sales slump with "one national home care provider in the fourth quarter of 2018" whose "order activity [had] slow[ed]." The press release went on to disclose a 9.5% drop in non-GAAP EBITDA from fiscal year ended December 31, 2017, resulting in a corresponding drop in its prior projections for fiscal 2019. These reductions in expectations for the upcoming year were attributed to the aforementioned drop in Inogen's stock price since its November 6, 2018 report.

15.     Following these disclosures, Inogen's stock price again fell, this time by $33.77 per share, or over 24%, to close at $106.28 per share on February 27, 2019. The trading volume represented more than seven times the average daily volume over the previous five trading days, for more than 3.64 million shares traded.

16.     Finally, on May 7, the Company issued a press release disclosing its financial results for the quarter ended March 31, 2019, and held a conference call with analysts and investors discussing the Company's financial results. During the call, Defendant Wilkinson revealed, in striking contrast to the Company's earlier representations, that the market for the Company's products had in fact become saturated, and that the Company's newer sales representatives "took longer to come up the productivity curve," and "were not at their full potential."

17.     On this news, the price of the Company's stock plunged yet again, from $91.14 per share at the close of trading on May 7, 2019, to $67.79 at the close of trading on May 8, 2019, a drop of more than 25%.

18.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by making and/or causing the Company to make false and misleading statements about Inogen's business, operations, and compliance. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company was exaggerating the scope of its TAM for its portable oxygen concentrators; (2) Inogen inaccurately reported the basis for its TAM determinations; (3) the Company misattributed its sales success to the skill of its salesforce, when the true reason lay in dishonest sales techniques used to manipulate customers to pay Inogen's higher prices; (4) Inogen reported exaggerated, unmaintainable growth in business-to-business domestic sales to HME suppliers, failing to disclose that such growth harmed its direct-to-consumer sales growth; (5) the Company overstated the proportion of its sales that were attributable to Medicare's steadier market; and (6) Inogen failed to maintain internal controls. As a result of the foregoing, Inogen's public statements were materially false and misleading at all relevant times.

19.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

20.     Furthermore, during the Relevant Period, seven of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales, obtaining proceeds of over $43.9 million.

21.     In light of the Individual Defendants' misconduct, which has subjected Inogen, its President and Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO"), to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California

(the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

22.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's and CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Inogen's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## <u>JURISDICTION AND VENUE</u>

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

24.     This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Individual Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

25.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

26.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

28.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

29.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

30.    Venue is proper in this District because Inogen and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

31.    Plaintiff is a current shareholder of Inogen common stock. Plaintiff has continuously held Inogen common stock at all relevant times.  Plaintiff is a citizen of the State of Oregon.

### Nominal Defendant Inogen

32.    Inogen is a Delaware corporation with its principal executive offices at 326 Bollay Drive, Goleta, CA 93117. Inogen's shares trade on the NASDAQ Global Select Market ("NASDAQ-GS") under the ticker symbol "INGN."

### Defendant Wilkinson

33.    Defendant Wilkinson has served as a director and the Company's CEO since January 1, 2017. He also served as COO and President of Inogen from January 1, 2016 to February 28, 2017. According to the Company's Schedule 14A filed with the SEC on March 26, 2019 (the "2019 Proxy Statement"), as of March 15, 2019, Defendant

Wilkinson beneficially owned 209,733 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2019 was $95.12, Defendant Wilkinson owned approximately $19.9 million worth of Inogen stock.

34. For the fiscal year ended December 31, 2018, Defendant Wilkinson received $2,687,338 in compensation from the Company. This sum included $494,458 in salary, $1,749,846 in stock awards, and $443,034 in non-equity incentive plan compensation.

35. During the period when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Wilkinson made the following sales of company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|------|--------|------|----------|
| January 16, 2018 | 30,651 | $115.40 | $3,537,125 |
| May 1, 2018 | 9,198 | $171.07 | $1,573,502 |
| August 1, 2018 | 17,188 | $200.17 | $3,440,522 |

Thus, in total, before the fraud was exposed, he sold 57,037 Company shares on inside information, for which he received approximately $8.5 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

36. The Company's 2019 Proxy Statement stated the following about Defendant Wilkinson:

> **Scott Wilkinson** has served as our Chief Executive Officer and President since March 1, 2017, and a Member of our Board since January 1, 2017. Previously, he served as our President and Chief Operating Officer from January 1, 2016 through February 28, 2017, and our Executive Vice President, Sales and Marketing from 2008 through December 31, 2015, and in this role he oversaw Inogen's global operations in sales, marketing, customer service, product management, medical billing, and clinical services. Prior to that, he served as our Director of Product Management from 2005 to 2006 and Vice President, Product Management from 2006 to

2008. From 2000 to 2005, Mr. Wilkinson worked for Invacare Corporation, a designer and manufacturer of oxygen products, as a Group Product Manager and helped launch their $100 million oxygen product line segment. From 1999 to 2000, Mr. Wilkinson served as a Product Line Director with Johnson & Johnson, a healthcare company. From 1988 to 1999, Mr. Wilkinson worked as a Research Scientist, Product Manager, and Project Leader at Kimberly Clark, a consumer products company. Mr. Wilkinson received a Bachelor of Science degree in Chemical Engineering from the University of Akron and an M.B.A. from University of Wisconsin, Oshkosh. The Board believes that he is qualified to serve as a director of Inogen due to his considerable knowledge and understanding of our business together with his extensive industry experience.

37.    Upon information and belief, Defendant Wilkinson is a citizen of the State of Ohio.

**Defendant Bauerlein**

38.    Defendant Alison Bauerlein ("Bauerlein") has served as Inogen's CFO since 2009. According to the 2019 Proxy Statement, as of March 15, 2019, Defendant Bauerlein beneficially owned 217,685 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2019 was $95.12, Defendant Bauerlein owned approximately $20.7 million worth of Inogen stock.

39.    For the fiscal year ended December 31, 2018, Defendant Bauerlein received $1,242,433 in compensation from the Company. This included $355,433 in salary, $699,853 in stock awards, and $181,868 in non-equity incentive plan compensation.

40.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Bauerlein made the following sales of Company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
| --- | --- | --- | --- |
| February 9, 2018 | 11,718 | $116.03 | $1,359,640 |
| February 12, 2018 | 15,912 | $116.77 | $1,858,044 |
| February 14, 2018 | 9,737 | $120.05 | $1,168,927 |

| February 15, 2018 | 1,982 | $120.09 | $   238,018 |
| February 16, 2018 | 8,808 | $125.03 | $1,101,264 |
| February 20, 2018 | 3,192 | $125.81 | $   401,586 |
| February 21, 2018 | 12,000 | $131.40 | $1,576,800 |
| March 8, 2018 | 15,911 | $124.96 | $1,988,239 |
| June 11, 2018 | 5,000 | $180.70 | $   903,500 |

Thus, in total, before the fraud was exposed, she sold 84,260 Company shares on inside information, for which she received approximately $10.6 million. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

41.     The Company's 2019 Proxy Statement stated the following about Defendant Bauerlein:

> **Alison Bauerlein** is a co-founder of Inogen and has served as our Chief Financial Officer since 2009 and Executive Vice President, Finance since March 2014. Ms. Bauerlein has also served as Corporate Secretary and Corporate Treasurer since 2002. Ms. Bauerlein previously served as our Vice President, Finance from 2008 until March 2014. Prior to serving in these positions, Ms. Bauerlein also served as Controller with our company from 2008 to 2009 and 2001 to 2004, and the Director of Financial Planning and Analysis from 2004 to 2008. Ms. Bauerlein has over 15 years' experience in treasury, finance, accounting, risk management as well as strategic and tactical cost analysis and forecasting. Ms. Bauerlein received a Bachelor of Arts degree in Economics/Mathematics with high honors from the University of California, Santa Barbara.

42.     Upon information and belief, Defendant Bauerlein is a citizen of the State of California.

## Defendant Anderson-Ray

43.     Defendant Benjamin Anderson-Ray ("Anderson-Ray") has served as a Company director since 2013, and he is a member of the Audit Committee. According to the 2019 Proxy Statement, as of March 15, 2019, Defendant Anderson-Ray beneficially owned 31,505 shares of the Company's common stock. Given that the price per share of

the Company's common stock at the close of trading on March 15, 2019 was $95.12, Defendant Anderson-Ray owned approximately $3 million worth of Inogen stock.

44.     With Defendant Raymond Huggenberger ("Huggenberger"), Defendant Anderson-Ray also serves on the Board of Directors for Sommetrics, Inc., a manufacturer of sleep apnea machines.

45.     For the fiscal year ended December 31, 2018, Defendant Anderson-Ray received $233,238 in compensation from the Company. This included $53,250 in cash compensation and $179,988 in option awards.

46.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Anderson-Ray made the following sales of Company stock, and made no purchase of Company stock:

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| January 2, 2018 | 1,000 | $119.06 | $119,060 |
| April 17, 2018 | 1,000 | $139.82 | $139,820 |
| July 2, 2018 | 1,000 | $184.88 | $184,880 |
| October 1, 2018 | 1,000 | $246.22 | $246,220 |

Thus, in total, before the fraud was exposed, he sold 4,000 Company shares on inside information, for which he received approximately $689,000. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

47.     The Company's 2019 Proxy Statement stated the following about Defendant Anderson-Ray:

*Benjamin Anderson-Ray* has served as a Member of our Board since 2013. He has been a Partner and Advisor with Trinitas Advisors, a consulting firm, since 2009. Prior to joining Trinitas Advisors, he served as the Chief Executive Officer of three manufacturing companies: Hubbardton Forge, LLC from 2008 to 2009, Chromcraft Revington, Inc. from 2005 to 2008 and Gravograph New Hermes from 2002 to 2004. Prior to that,

Mr. Anderson-Ray held various senior leadership roles at Sunrise Medical, Inc., a global manufacturer and distributor of durable medical equipment, including President of the Global Business Group in 2001, President of the Continuing Care Group from 1998 to 2000, and President of the Mobility Products Division from 1996 to 2001. Earlier in his career, Mr. Anderson-Ray held management and marketing roles at GE Lighting, a lighting solutions company, from 1984 to 1993, Black & Decker Home Products, a product manufacturing company, from 1993 to 1994, and Rubbermaid Home Products, a manufacturer and distributor of household items, from 1994 to 1996. He currently serves on the Board of Directors of Sommetrics, Inc. Mr. Anderson-Ray has Bachelor of Art and Science degrees in Marketing and Horticulture from Michigan State University and an M.B.A. from the University of Michigan. The Board believes that he is qualified to serve as a director of Inogen because of his leadership experience and his extensive industry experience.

48.     Upon information and belief, Defendant Anderson-Ray is a citizen of the State of Vermont.

**Defendant Beardsley**

49.     Defendant Scott Beardsley ("Beardsley") has served as a Company director since January 1, 2017, and he is a member of the Compensation, Nominating and Governance Committee.

50.     Defendant Beardsley is also a Managing Partner of Novo Ventures (US), a consulting company and subsidiary of Novo Holdings A/S ("Novo"). Defendant Beardsley purportedly "is not deemed to be a beneficial owner of, nor does he have a reportable pecuniary interest in, the shares held by Novo Holdings A/S." According to the 2019 Proxy Statement, Novo beneficially owns more shares of Inogen than any other company or individual, owning 3,549,320 (16.19%) of the Company's shares as of March 15, 2019.

51.     The Company's 2019 Proxy Statement stated the following about Defendant Beardsley:

*Scott A. Beardsley* has served as a Member of our Board since January 1, 2017. Mr. Beardsley is employed as a Managing Partner by Novo Ventures (US), Inc., which provides certain financial investment consultancy services

to Novo Holdings A/S, a Danish limited liability company that manages investments and financial assets. Mr. Beardsley has worked within Novo Holdings A/S and its investment activities since 2009 in several roles: since January 2018, Mr. Beardsley has been employed by Novo Ventures (US) Inc. as a Managing Partner; from 2016 through 2017, he was employed as a Senior Partner by Novo Ventures (US) Inc.; from December 2012 through 2015, he was employed as a Partner by Novo Ventures (US) Inc.; and from 2009 through 2012, he was employed as a Senior Partner by Novo Holdings A/S. Prior to joining Novo Holdings A/S, Mr. Beardsley was a Managing Director in the Health Care Group at J.P. Morgan, a banking and financial services company, from 2006 through 2008, and a Managing Director in the Health Care Group of US Bancorp Piper Jaffray, an investment bank, from 2001 to 2006. Previously, Mr. Beardsley was an investment banker at US Bancorp, Piper Jaffray, Montgomery Securities, an investment bank, and Kidder, Peabody & Co. Incorporated, an investment bank. Mr. Beardsley currently serves as a member of the Board of Directors of Unchained Labs, a life sciences tools company. Mr. Beardsley received his M.B.A. from the Anderson Graduate School of Management at UCLA and his Bachelor of Science in Business Administration from Colorado State University. The Board believes that he is qualified to serve as a director of Inogen due to his extensive financial experience and his experience as a venture capital investor and investment banker in the life sciences industry.

52.     Upon information and belief, Defendant Beardsley is a citizen of the State of California.

**Defendant Greer**

53.     Defendant R. Scott Greer ("Greer") has served as a Company director since August 2015, and also serves as the Chairperson of the Audit Committee. According to the 2019 Proxy Statement, as of March 15, 2019, Defendant Greer beneficially owned 60,692 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2019 was $95.12, Defendant Greer owned approximately $5.8 million worth of Inogen stock.

54.     For the fiscal year ended December 31, 2018, Defendant Greer received $240,738 in compensation from the Company. This included $60,750 in cash compensation and $179,988 in option awards.

55.     The Company's 2019 Proxy Statement stated the following about Defendant Greer:

> **R. Scott Greer** has served as a Member of our Board since August 2015 and Chairperson of the Audit Committee since January 1, 2018. Since June 2003, Mr. Greer has served as Managing Director of Numenor Ventures, LLC, a venture capital firm. In 1996, Mr. Greer co-founded Abgenix, Inc., a company that specialized in the discovery, development and manufacture of human therapeutic antibodies, and from June 1996 through May 2002, he served as its Chief Executive Officer. He also served on the Board of Directors of Abgenix from 1996 and Chairman of the Board of Directors from 2000 until the acquisition of Abgenix by Amgen, Inc. in April 2006. Prior to Abgenix's formation, Mr. Greer held senior management positions at Cell Genesys, Inc., a biotechnology company, initially as Chief Financial Officer and Vice President of Corporate Development and later as Senior Vice President of Corporate Development, and various positions at Genetics Institute, Inc., a biotechnology research and development company. Mr. Greer currently serves as a Member of the Board of Directors of Nektar Therapeutics, a publicly-traded biopharmaceutical company (NKTR). Mr. Greer holds a Bachelor of Arts in Economics from Whitman College and an M.B.A. from Harvard University. He also was a Certified Public Accountant. The Board believes that he is qualified to serve as a director of Inogen because of his experience as an accountant and as an executive and director of various public and private biotechnology and biopharmaceutical companies.

56.     Upon information and belief, Defendant Greer is a citizen of the State of Arizona.

**Defendant Huggenberger**

57.     Defendant Huggenberger has served as a Company director since 2018. He also served as the Company's President from January 1, 2008 to January 1, 2016 and as its CEO from January 1, 2008 until January 1, 2017.

58.     Defendant Huggenberger, with Defendant Anderson-Ray, also serves on the Board of Directors of Sommetrics, Inc.

59.     According to the 2019 Proxy Statement, as of March 15, 2019, Defendant Huggenberger beneficially owned 89,584 shares of the Company's common stock. Given

that the price per share of the Company's common stock at the close of trading on March 15, 2019 was $95.12, Defendant Huggenberger owned approximately $8.5 million worth of Inogen stock.

60.    For the fiscal year ended December 31, 2018, Defendant Huggenberger received $223,738 in compensation from the Company. This included $43,750 in cash compensation and $179,988 in option awards.

61.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Huggenberger made the following sales of Company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| November 15, 2017 | 14,000 | $118.52 | $1,659,280 |
| December 15, 2017 | 14,000 | $119.98 | $1,679,720 |
| January 16, 2018 | 13,000 | $116.19 | $1,510,470 |
| June 15, 2018 | 10,444 | $183.50 | $1,916,474 |
| July 16, 2018 | 10,593 | $194.59 | $2,061,292 |
| August 15, 2018 | 10,500 | $228.83 | $2,402,715 |
| September 14, 2018 | 10,500 | $282.52 | $2,966,460 |
| October 15, 2018 | 10,500 | $197.40 | $2,072,700 |
| November 15, 2018 | 9,569 | $129.44 | $1,238,611 |
| December 14, 2018 | 8,500 | $130.39 | $1,108,315 |
| January 15, 2019 | 8,500 | $138.74 | $1,179,290 |

Thus, in total, before the fraud was exposed, he sold 120,106 Company shares on inside information, for which he received approximately $19.8 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

62.    The Company's 2019 Proxy Statement stated the following about Defendant Huggenberger:

***Raymond Huggenberger*** has served as a Member of our Board since 2008. Mr. Huggenberger previously served as our Chief Executive Officer from 2008 until March 1, 2017 and as our President from 2008 until January 1, 2016. Prior to joining our company, Mr. Huggenberger held various management positions with Sunrise Medical Inc., a global manufacturer and distributor of durable medical equipment, including: Vice President of Marketing for Sunrise's German subsidiary from 1994 to 1996, President of Sunrise's German division from 1998 until 2000, President of the European Operating Group from 2000 to 2002, President and Chief Operating Officer from 2002 until 2004, and President of European Operations 2006 to 2007. Mr. Huggenberger also held a consultant position with McDermott and Bull Inc., an executive search firm, from 2005 to 2006 and the position of Managing Director in the healthcare division of TA Triumph Adler AG, a document process management firm, from 1996 to 1998. Mr. Huggenberger currently serves on the Board of Directors of Wellfount Corporation, a pharmacy services company. He also serves on the Board of Directors of Tactile Systems Technology Inc., a publicly-traded company (TCMD), Clarify Medical Inc., Ebb Therapeutics, and Sommetrics, Inc., which are all medical device companies. Mr. Huggenberger graduated from AKAD University in Rendsburg, Germany in Economics and completed the Advanced Marketing Strategies Program at INSEAD, Fontainebleau, France. The Board believes that he is qualified to serve as a director of Inogen because of his deep understanding of our business, operations and strategy and extensive executive and director roles with healthcare companies.

63.     Upon information and belief, Defendant Huggenberger is a citizen of the State of California.

**<u>Defendant Lukatch</u>**

64.     Defendant Heath Lukatch ("Lukatch") has served as a Company director since 2006 and as Chairperson of the Board since 2008. He is also a member of the Compensation, Nominating and Governance Committee. According to the 2019 Proxy Statement, as of March 15, 2019, Defendant Lukatch beneficially owned 33,318 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2019 was $95.12, Defendant Lukatch owned approximately $3.2 million worth of Inogen stock.

65.    For the fiscal year ended December 31, 2018, Defendant Lukatch received $296,238 in compensation from the Company. This included $116,250 in cash compensation and $179,988 in option awards.

66.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Lukatch made the following sales of Company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| December 1, 2017 | 2,500 | $126.73 | $316,825 |
| March 1, 2018 | 2,500 | $119.59 | $298,975 |
| June 6, 2018 | 500 | $190.58 | $ 95,290 |
| July 6, 2018 | 500 | $193.66 | $ 96,830 |
| August 6, 2018 | 500 | $211.41 | $105,705 |
| September 6, 2018 | 500 | $261.75 | $130,875 |
| October 5, 2018 | 500 | $217.45 | $108,725 |
| November 6, 2018 | 500 | $194.85 | $ 97,425 |

Thus, in total, before the fraud was exposed, he sold 8,000 Company shares on inside information, for which he received approximately $1.2 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

67.    The Company's 2019 Proxy Statement stated the following about Defendant Lukatch:

**Heath Lukatch, Ph.D.** has served as Chairperson of our Board since 2008, and as a director since 2006. Dr. Lukatch is employed as a Partner and Managing Director at TPG Biotech. Dr. Lukatch joined TPG Biotech in 2015. Prior to joining TPG Biotech, Dr. Lukatch was a Partner at Novo Ventures (US) Inc., which provides certain consultancy services to Novo Holdings A/S. Dr. Lukatch joined Novo Ventures (US) Inc. in 2006. From 2001 to 2006, Dr. Lukatch was a Managing Director responsible for biotechnology venture investments at Piper Jaffray Ventures and SightLine Partners, a private equity firm and spin off of Piper Jaffray Ventures. Prior to joining Piper Jaffray Ventures, Dr. Lukatch worked as a strategy

consultant with McKinsey & Company, a consulting firm, from 1997 to 2000. Dr. Lukatch also served as co-founder and Chief Executive Officer of AutoMate Scientific, a biotechnology instrumentation company from 1991 to 1997, and held scientific positions with Chiron Corporation, a biotechnology company, from 1990 to 1991, Roche Bioscience, a healthcare company, from 1996 to 1997, and Cetus Corporation, a biotechnology company, in 1987. He currently serves on the Boards of Directors of Adynxx, Ceribell, Engage Therapeutics, Flexion Therapeutics, Inc. (FLXN), Halo Neuroscience, Satsuma Pharma, SutroVax, Viacyte and ViewPoint Therapeutics. Dr. Lukatch received his Ph.D. in Neuroscience from Stanford University where he was a DOD USAF Fellow, and his Bachelor of Arts in Biochemistry from the University of California at Berkeley. The Board believes that he is qualified to serve as a director of Inogen because of his extensive industry experience and experience as a venture capital investor and a board member for several venture-backed healthcare companies.

68.    Upon information and belief, Defendant Lukatch is a citizen of the State of California.

**Defendant McFarland**

69.    Defendant Loren McFarland ("McFarland") has served as a Company director since 2013, and he is a member of the Audit Committee. According to the 2019 Proxy Statement, as of March 15, 2019, Defendant McFarland beneficially owned 46,403 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2019 was $95.12, Defendant McFarland owned approximately $4.4 million worth of Inogen stock.

70.    For the fiscal year ended December 31, 2018, Defendant McFarland received $236,238 in compensation from the Company. This included $56,250 in cash compensation and $179,988 in option awards.

71.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant McFarland made the following sales of Company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| March 1, 2018 | 2,000 | $119.31 | $238,620 |

| May 11, 2018 | 2,125 | $181.17 | $384,986 |
| August 9, 2018 | 2,000 | $229.99 | $459,980 |
| November 8, 2018 | 2,000 | $155.24 | $310,480 |

Thus, in total, before the fraud was exposed, he sold 8,125 Company shares on inside information, for which he received approximately $1.4 million. Defendant McFarland's insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

72.     The Company's 2019 Proxy Statement stated the following about Defendant McFarland:

> *Loren McFarland* has served as a Member of our Board since 2013.  He has been President and Managing Member of Santa Barbara Financial Services, LLC since 2008. Prior to founding Santa Barbara Financial Services, he served as the Chief Financial Officer and Treasurer of Mentor Corporation, a medical equipment company, from 2004 to 2007. Prior to that, Mr. McFarland fulfilled various finance and accounting roles at Mentor from 1985 to 2004. He worked as a Certified Public Accountant and Audit Supervisor with Touche Ross & Co., an accounting firm, from 1981 to 1985 and served in the North Dakota Army National Guard from 1978 to 1984. He currently serves on the Board of Directors and as the Chief Financial Officer of Cure Medical, LLC, a privately held manufacturer of disposable urology products, on the Board of Directors of the MIT Enterprise Forum of the Central Coast and chairs the parish finance council for St. Mark's University Parish, Isla Vista, CA.  Previously, Mr. McFarland served on the Board of Directors of Patient Safety Technologies, Inc., an acquired publicly-traded medical device company, as the Financial Expert on the Audit Committee and as a Member of the Compensation, Nominating and Governance Committee. Mr. McFarland has a Bachelor of Arts degree in Accounting from the University of North Dakota and an M.B.A. from the University of California, Los Angeles. He completed an ISS Director Certification Program in October 2008 at the University of California, Los Angeles' Anderson School.  The Board believes that he is qualified to serve as a director of Inogen because of his leadership experience and his extensive experience in finance and accounting.

73.     Upon information and belief, Defendant McFarland is a citizen of the State

of California.

**Defendant Rider**

74.     Defendant Heather Rider ("Rider") has served as a Company director since 2014. Currently, Defendant Rider serves as the Chairperson of the Compensation, Nominating and Governance Committee. According to the 2019 Proxy Statement, as of March 15, 2019, Defendant Rider beneficially owned 26,489 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 15, 2019 was $95.12, Defendant Rider owned approximately $2.5 million worth of Inogen stock.

75.     For the fiscal year ended December 31, 2018, Defendant Rider received $240,238 in compensation from the Company. This included $60,250 in cash compensation and $179,988 in option awards.

76.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Rider made the following sales of Company stock, and made no purchases of Company stock:

| Date | Shares | Cost | Proceeds |
|---|---|---|---|
| February 26, 2018 | 5,222 | $131.60 | $687,215 |
| June 6, 2018 | 2,250 | $191.09 | $429,953 |
| September 6, 2018 | 2,250 | $259.55 | $583,988 |

Thus, in total, before the fraud was exposed, she sold 9,722 Company shares on inside information, for which she received approximately $1.7 million. Her insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

77.     The Company's 2019 Proxy Statement stated the following about Defendant Rider:

> **Heather Rider** has served as a Member of our Board since 2014 and Chairperson of the Compensation, Nominating and Governance Committee

since January 1, 2018.  From 2012 to 2013, Ms. Rider served as Vice President, Global Human Resources of Cymer, Inc., a publicly-traded supplier of light sources for semiconductor manufacturing that was acquired by ASML Holding NV in 2013.  From October 2010 to September 2012, Ms. Rider served as Senior Vice President, Global Human Resources of Alphatec Holdings, Inc., a publicly-traded medical device company focused on surgical treatment of spine disorders, and from 2006 to 2010, she served as Vice President, Human Resources of Intuitive Surgical, Inc., a publicly-traded manufacturer of robotic surgical systems. From 2001 to 2005, Ms. Rider served as Senior Vice President of Global Human Resources of Sunrise Medical, Inc., a global manufacturer and distributor of durable medical equipment.  From 1998 to 2001, Ms. Rider served as Vice President of Human Resources of Biosense Webster, a member of the Johnson & Johnson family of companies, and a medical device manufacturer of intracardiac catheters and location technology. Prior to 1998, Ms. Rider served as Head of Human Resources for City of Hope, a leading research and treatment center for cancer, diabetes and other life-threatening diseases, CAP/MPT, a medical malpractice provider for physicians in California and medical malpractice insurance for large physician groups and hospitals, and Environmental Diagnostics International, a bio-diagnostics company with focus on the detection of environmental compounds and diseases using monoclonal antibody technology. Ms. Rider holds a Bachelor of Arts in Psychology from Claremont McKenna College and an M.B.A. from Pepperdine University.  The Board believes that she is qualified to serve as a director of Inogen because of her extensive executive-level experience with healthcare and life science companies.

78.     Upon information and belief, Defendant Rider is a citizen of the State of California.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

79.     By reason of their positions as officers, directors, and/or fiduciaries of Inogen and because of their ability to control the business and corporate affairs of Inogen, the Individual Defendants owed Inogen and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Inogen in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Inogen and its shareholders so as to benefit all shareholders equally.

80.     Each director and officer of the Company owes to Inogen and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

81.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Inogen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

82.     To discharge their duties, the officers and directors of Inogen were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

83.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Inogen, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Inogen's Board at all relevant times.

84.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ-GS, the Individual Defendants, had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements,

business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

85.     To discharge their duties, the officers and directors of Inogen were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Inogen were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Inogen's own Code of Ethics and Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Inogen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Inogen and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Inogen's operations would comply with all applicable laws and Inogen's financial statements and regulatory filings

filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

86.     Each of the Individual Defendants further owed to Inogen and the shareholders the duty of loyalty requiring that each favor Inogen's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

87.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Inogen and were at all times acting within the course and scope of such agency.

88.     Because of their advisory, executive, managerial, and directorial positions with Inogen, each of the Individual Defendants had access to adverse, non-public information about the Company.

89.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Inogen.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

90.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

91.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.

92.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the eight Individual Defendants who are Directors was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

93.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

94.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Inogen and was at all times acting within the course and scope of such agency.

## INOGEN'S CODE OF CONDUCT

95.     The Company's Code of Ethics and Conduct (the "Code of Conduct") "applies to all Inogen employees (including officers) and directors of Inogen."

96.     The Code of Conduct contains a section pertaining to insider trading, reminding employees that it is unethical and illegal, stating in relevant part:

> No employee or director in possession of material, non-public information may trade Inogen's securities (or advise others to trade) from the time they obtain such information until after adequate public disclosure of the information has been made. Those subject to this Code who knowingly trade Inogen securities while in possession of material, non-public information or who tip information to others may be subject to appropriate disciplinary and/or enforcement action, which may include termination of employment, consistent with applicable laws.

97.     The Code of Conduct also speaks to the Company's policies on fair dealing, stating in relevant part:

> Inogen seeks to excel while operating fairly and honestly, never through unethical or illegal business practices. Each employee and director should endeavor to deal fairly with Inogen's customers, suppliers, vendors, competitors, and employees. No employee or director should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair dealing practices.

98.     The Code of Conduct's section on recordkeeping outlines its requirement of honest and accurate reporting of books, records, accounts, and financial statements:

> All of Inogen's books, records, accounts, and financial statements must… appropriately reflect the transactions and matters to which they relate, and must conform both to applicable legal requirements, accounting standards and to Inogen's system of internal control requirements… The omission of,

or making of false or misleading entries into, records or documentation is strictly prohibited…

99.     The Code of Conduct also addresses the Company's disclosure obligations, emphasizing its commitment to full compliance with relevant regulations and laws:

> Inogen files reports and other documents with the Securities and Exchange Commission, the NASDAQ Global Market, tax authorities, and other governmental and regulatory agencies. In addition, from time to time, Inogen makes other public announcements, such as issuing press releases. Employees involved in the preparation of these reports, documents, or announcements are expected to use all reasonable care and efforts to ensure that Inogen's disclosures and presentations are fair, complete, accurate, objective, relevant, timely and understandable. In addition, employees are expected to comply with Inogen's disclosure controls and procedures, which are designed to ensure full, fair, accurate, timely and understandable disclosure in our public reports and communications. If an employee believes that any public disclosure by Inogen is materially false or misleading, if any employee becomes aware of material information that the employee believes should be disclosed to the public, or if any employee believes that questionable accounting or auditing conduct or practices have occurred or are occurring, the employee should follow the reporting procedures in Section III…

100.     The Code of Conduct also contains a section outlining both its reporting requirement for illegal or unethical behavior, and its 'no retaliation' policy. Specifically, the Code of Conduct states, in relevant part, that:

> Any employee or director who observes possible unethical or illegal conduct is encouraged to report such concerns. Reprisal, threats, retribution, or retaliation against any person who has, in good faith, reported a violation or suspected violation of law, this Code, or other Inogen policies, or against any person who, in good faith, is assisting in any investigation or process with respect to such a violation, is prohibited.

101.     The Individual Defendants violated Inogen's Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the investing public and to facilitate and disguise the Individual Defendants' violations of

law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, and failing to report the same.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

102.   Inogen is an American medical technology company headquartered in California that designs, manufactures, and markets portable oxygen concentrators. Portable oxygen concentrators are primarily used to administer 'oxygen therapy' to patients with various respiratory problems, including COPD, chronic bronchitis, and emphysema.

103.   The Company reported that for the fiscal year ended December 31, 2017, during which it acquired a new Dutch subsidiary, 22.3% of its total revenue came from outside the United States. That year, Inogen sold products in 45 foreign countries spanning North America, Latin America, Europe, Africa, the Middle East, and the Asia-Pacific Region.

104.   Inogen reports its finances through three sales channels: direct-to-consumer; business-to-business; and international. Direct-to-consumer sales concern domestic purchases directly between Inogen and an individual patient, whereas business-to-business sales represent domestic transactions between Inogen and HME providers.

105.   During the Relevant Period, unbeknownst to Inogen's investors, the Company engaged in fraudulent marketing techniques in its direct-to-consumer sales, most prominently by falsely representing that Inogen's oxygen concentrator was covered by Medicare, but that its competitors' products were not.

106.   Inogen's stated growth projections during the Relevant Period were based largely on a disreputable research company named WinterGreen Research, Inc. In its report to Inogen, WinterGreen plagiarized the New York Times and cherry-picked Medicare statistics, purposefully selecting a metric that counts a one-week oxygen user

equally with a one-year oxygen user, to inflate the size of the general oxygen market as well as Inogen's customer base.

107.   A former Company employee, cited as a confidential witness in the Securities Class Action, worked as an Inside Sales Representative at the Company's Cleveland office during the Relevant Period, and personally observed practices that contradicted the Individual Defendants' public statements about the Company's salesforce.

108.   Beginning at least in September 2017, the former Inside Sales Representative, who was responsible for contacting prospective customers and selling the Company's portable oxygen concentrators to them, frequently observed other Company sales representatives lie to prospective customers about their Medicare eligibility, in order to make out-of-pocket sales. The Inside Sales Representative noted that Medicare authorities discovered these practices during the fall of 2018, and threatened to revoke the Company's Medicare accreditation. As a result, the Company was forced to make changes to its training program to address the fraudulent and abusive sales tactics.

109.   According to the Inside Sales Representative, the Company's leadership was aware of and condoned these fraudulent and abusive practices. The Inside Sales Representative stated that Defendant Wilkinson was present at the Company's Cleveland Office at least once a month, and would have observed the same practices that the Inside Sales Representative observed.

110.   Moreover, the Inside Sales Representative maintained that Defendant Wilkinson conducted quarterly town hall meetings at the Company's Cleveland office. At one of these town hall meetings during the summer of 2018, after Defendant Wilkinson discussed the Company's TAM figures, the Inside Sales Representative directly asked Defendant Wilkinson whether he actually believed that all of the people reflected in the Company's addressable market figures would buy portable oxygen concentrators from

the Company. According to the Inside Sales Representative, Defendant Wilkinson responded in the negative.

111.   Beginning in November 2017, the Company issued multiple statements through SEC filings and press releases that reported an artificially inflated TAM and exaggerated the skill of its salesforce. Inogen accordingly projected robust growth for its domestic sales channels in its public statements to investors, analysts, and the SEC from November 2017 through February 2019.

**False and Misleading Statements**

*November 7, 2017 Press Release, 10-Q, and Conference Call*

112.   After the market closed on November 7, 2017, Inogen issued a press release publishing its financial results for the third fiscal quarter of 2017, ended September 30, 2017, and offering projections for the final quarter of 2017.

113.   The Company celebrated its "[r]ecord total revenue of $69.0 million," and boosted its projections for fourth quarter 2017 revenue to a "range [of]… $244 to $288 million… [for] year-over-year growth of 20.3% to 22.3%, and compares to previous guidance of $239 to $243 million." Inogen predicted that its two domestic channels would have the most robust growth, with "rental revenue [expected] to decline in 2017 compared to 2016 by approximately 32%." While the Company maintained its prior net income for the fiscal year 2017, it increased its 2017 Adjusted EBITDA to $49-51 million (from $48-$50 million) and gave a predicted range for 2018 total income of $295-$305 million (an increase of 19.9%-24.0% from 2017's guidance midpoint). The release went on to predict that direct-to-consumer sales would experience the most growth, with "relatively flat" rental revenue, in 2018, along with a "net income estimate of $31 to $35 million" for fiscal year 2018. Finally, Inogen estimated an Adjusted EBITDA of $60 to $64 million for the fiscal year 2018, an increase of 20-28% over 2017's mid-point guidance.

114.   Inogen's sales growth was a triumphant focus for the press release, with the Company "increasing its guidance range for full year 2017 revenue to $244 to $248 million, which represents year-over-year growth of 20.3% to 22.3%, and compares to previous guidance of $239 to $243 million. The Company expects direct-to-consumer sales and domestic business-to-business sales to be our strongest growing channels and to have similar growth rates" for the remainder of fiscal year 2017.

115.   The press release attributed the Company's impressive performance, and its optimistic projections, to the strength of the market and the ability of its salesforce, stating:

> The third quarter of 2017 was a record revenue quarter for us, driven by increased sales in our domestic business-to-business and direct-to-consumer channels... We are executing on our strategic initiatives and remain focused on increasing adoption of our best-in-class oxygen product offerings across all of our channels. We believe we should see strong results in 2018 as portable oxygen concentrators continue to be adopted worldwide.

116.   The same day, Inogen filed its quarterly report with the SEC on Form 10-Q ("3Q17"), which addressed its sales growth and TAM projections:

> Portable oxygen concentrators represented the fastest-growing segment of the Medicare oxygen therapy market between 2012 and 2016. The Company estimates based on 2016 Medicare data that patients using portable oxygen concentrators represent approximately 9.1% of the total addressable oxygen market in the United States, although the Medicare data does not account for private insurance and cash-pay sales into the market. Based on 2016 industry data, the Company believes it was the leading worldwide manufacturer of portable oxygen concentrators… Since adopting the Company's direct-to-consumer strategy in 2009 following its acquisition of Comfort Life Medical Supply, LLC, which had an active Medicare billing number but few other assets and limited business activities, the Company has directly sold or rented more than 327,000 of its Inogen oxygen concentrators as of September 30, 2017.

117.    Attached to the 3Q17 were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Wilkinson and Bauerlein attesting to the accuracy of the 3Q17.

118.    Finally, Defendant Wilkinson also held a conference call on November 7, 2017, again touting the skill of Inogen's salesforce and crediting it with the Company's present and projected revenue growth, stating, in pertinent part:

> We continued to steadily invest in direct-to-consumer sales force additions in the United States. ***We also worked to optimize our new customer relationship management, or CRM system***, and I'm pleased that we have delivered such strong sales and solid bottom line results during the third quarter while we were still investing in training and productivity improvements in the system.

(Emphasis added).

119.    Defendant Bauerlein also spoke to Inogen's growth and TAM, comparing management's expectations for its two domestic channels and stating, in relevant part:

> So when you look at that, while certainly B2B has a lower gross margin profile, it also has much lower operating expenses associated with it. So when we look at the market opportunity, we look to capture share both on the B2B side and the direct to consumer side, because we're relatively agnostic on the bottom-line. What we have been doing though is continuing to invest in the B2C side, because we're still very early in the market penetration curve, as Scott said earlier, 9% or so penetration in the last data as of the end of 2016. We still have a long ramp to go to continue to take share, both on the direct-to-consumer side, as well as the business to business side away from the tank-based business model.
>
> So our focus really is to make sure that we maintain a market leadership position, and that we continue to grow the market both on direct-to-consumer side and the B2B side and not to drive a specific mix in our business. Now, inherent in guidance in 2018 is that direct-to-consumer sales would be the fastest growing channel. So that would actually be a tailwind to gross margin expansion over the course of the year.

120.   With respect to the Company's workforce, Defendant Bauerlein further stated, in relevant part:

> We've been able to continue to add to our Cleveland site as well.  And while you know that those sales reps take 4 to 6 months to come up to productivity, we are starting to see the contributions from the people we have hired in the first half of the year, and we expect the people that we hired in the second half of the year to really contribute more materially going into 2018. ***And that's really why we still expect in 2018 direct-to-consumer sales to be the fastest-growing channel in our business*** because we are continuing to invest there.  And that's why we really expect that to continue to be the key driver to our sales growth.

(Emphasis added).

121.   These announcements were met with a favorable market response on November 8, 2019, when Inogen's stock increased from the prior day's close of $101.65 to $117.38 per share on more than 2.4 million shares traded.

### January 2018 J.P. Morgan Healthcare Conference

122.   On January 9, 2018, Defendants Wilkinson and Bauerlein attended the annual J.P. Morgan Healthcare Conference. At the conference, Defendant Wilkinson discussed the Company's market strategy, and the sources of the Company's recent growth, stating:

> As I noted, while our primary go-to-market strategy is to focus on patients, the Medicare competitive bidding cuts have put pressure on the providers, such that delivering tanks is simply unsustainable.  They've looked at Inogen as the leader in the space to help them transition their model from a delivery model to a nondelivery one.  We're the company that has 10 years' experience employing a nondelivery model ourselves.  So we've proven that the model works, we've proven it with our products.  So our value to that provider channel is not only in the best product on the market, with a strong reliability but also in our know-how and how to administer the nondelivery model.  ***You see there we've had great growth results through our direct-to-consumer strategy, but we've also had incredible growth through the business-to-business channel in the United States***.  So we've reaped the benefits on both side through our direct-to-consumer approach.

(Emphasis added).

123.   Also at the conference, Defendant Bauerlein touted the Company's cash out-of-pocket sales, stating:

> Sales have been growing very nicely on the direct-to-consumer side, over 40% in the third quarter. And now, this is really people who are buying retail out-of-pocket, showing the true demand for POCs, in the fact that patients really have an interest in getting a POC instead of the tank-based systems that they already have.

124.   Defendant Bauerlein went on to emphasize the relationship between the Company's salesforce and its growth, stating:

> So as we said, we really did want to invest in the sales team because that's our #1 limiter to growth and we were able to execute that.  Majority of those sales rep additions were in the Cleveland facility, so that started in September and through the end of the year.  So these people are still in the very early stages of coming up the curve of productivity.  They take about 4 to 6 months to come up to productivity.  ***And this is the main driver of why we expect, in 2018, to have $300 million in sales at the midpoint of guidance.  Because we expect direct-to-consumer sales to be the fastest-growing segment because of the investments that we've made in the inside sales team in 2017.  And we expect to continue to expand that team going into 2018***.  And that Cleveland area facility, over the next 3 years, we expect to add 240 employees, a mix of sales and service employees.

(Emphasis added).

### *February 27, 2018 10-K, Press Release, and Conference Call*

125.   On February 27, 2018, the Company filed its Annual Report for the fiscal year ended December 31, 2017 with the SEC on Form 10-K (the "2017 10-K"), signed by all nine of the Individual Defendants.

126.   Like the November 7, 2017 press release, the 2017 10-K highlighted both the strong portable oxygen market and its secure position therein, stating, in relevant part:

> Portable oxygen concentrators represented the fastest-growing segment of the Medicare oxygen therapy market between 2012 and 2016. We estimate

based on 2016 Medicare data that the total number of patients using portable oxygen concentrators represents approximately 9.1% of the total addressable oxygen market in the United States, although the Medicare data does not account for private insurance and cash-pay patients in the market. Based on 2016 industry data, we believe we were the leading worldwide manufacturer of portable oxygen concentrators.

* * *

**Our market**

**_We believe the current total addressable oxygen therapy market in the United States is approximately $3 billion to $4 billion_**, based on 2016 Medicare data and our estimate of the ratio of the Medicare market to the total market. As of 2016, we estimate that there are 4.5 million patients worldwide who use oxygen therapy, **_including 2.5 to 3 million patients in the United States_**, and more than 60% of oxygen therapy patients in the United States are covered by Medicare. **_The number of oxygen therapy patients in the United States is projected to grow by approximately 7% to 10% per year between 2017 and 2021_**, which we believe is the result of earlier diagnosis of chronic respiratory conditions, demographic trends and longer durations of long-term oxygen therapy.

* * *

According to our analysis of 2016 Medicare data, approximately 70% of U.S. oxygen users require ambulatory oxygen and the remaining 30% are considered stationary, and either require oxygen twenty-four hours a day, seven days a week, or 24/7, but are not ambulatory, or do not require oxygen 24/7 and only need nocturnal oxygen… Despite the ability of portable oxygen concentrators to address many of the shortcomings of traditional oxygen therapy, **_we estimate based on 2016 Medicare data that the total number of patients on portable oxygen concentrators represents approximately 9.1% of the total addressable oxygen market in the United States_**, although the Medicare data does not account for private insurance and cash-pay patients in the market.

(Emphasis added).

127.   Attached to the 2017 10-K were SOX certifications signed by Defendants Wilkinson and Bauerlein, attesting to the accuracy of the 2017 10-K.

128.   On that same day, Inogen issued a press release reporting its financial information for the fiscal year ended December 31, 2017 and its projections for the fiscal

year ended December 31, 2018. The Company reported that for the fiscal year 2017 "[t]otal revenue of $63.8 million" had gone "up 25.4% over the same period in 2016," and it used this figure, *inter alia*, to justify its ambitious fiscal year 2018 projections of "full year 2018 GAAP net income and non-GAAP net income guidance range to $36 to $39 million, up from $31 to $35 million, representing growth of 71.4% to 85.7% compared to 2017 GAAP income of $21.0 million and growth of 26.0% to 36.5% compared to 2017 non-GAAP net income of $28.6 million." Inogen also planned on "maintaining its guidance range for full year 2018 Adjusted EBITDA of $60 to $64 million, representing 18.0% to 25.9% growth compared to 2017 results." In more general terms, the Company predicted "direct-to-consumer sales to be its fastest growing channel, domestic business-to-business sales to have a solid growth rate," and finally for "rental revenue to be relatively flat in 2018 compared to 2017, as the Company continues to focus on sales versus rentals."

129.   Also on February 27, 2018, the Company hosted a conference call, during which Defendant Wilkinson discussed the Company's sales growth and strategy, stating, in relevant part:

> Our record direct-to-consumer sales of $24.5 million in the fourth quarter of 2017 exceeded our expectations, as we steadily added new inside sales representatives, with most located in our new Cleveland facility.  Our direct-to-consumer sales team consisted of 263 inside sales reps as of December 31, 2017, which represented an increase of 86 reps over our 2016 year-end total of 177.
>
> Our strategy is to steadily hire additional sales representatives throughout 2018 and continue to invest in marketing activities to increase consumer awareness as we believe this is still our most effective means to drive growth of direct-to-consumer sales.

130.   Defendant Wilkinson further detailed the Company's sales strategy with respect to the distribution of prospective customer leads across the Company's salesforce, stating:

[W]e don't assign territories to the inside reps. We've got leads coming in every day from all over the USA, and they are distributed more or less evenly across the sales force. So the way we manage the sales team is every rep is going to get x number of new leads every month. By not assigning territories, it's made it really easy for us to scale, because if you think about it, if we did have more territories, then you've got to rebalance and recut your sales territories really almost every month the way we've scaled the sales team.

131. Defendant Wilkinson also discussed the Company's market penetration, stating that it is "relatively easy to sell somebody a unit if they have the money, because it's hard to put a price on freedom," and the "opportunity today is still using our sales team to convert oxygen patients, so that's what we're focused on."

132. During the conference call, a J.P. Morgan analyst asked Defendant Bauerlein "about what the historical correlation has been from adding new sales reps and how that translates into sales growth going forward." Defendant Bauerlein addressed this question as follows:

> *So it has closely correlated with, over time, the sales growth in that direct-to-consumer sales channel*. So we would expect that as we've added this additional sales capacity outside of that first 4- to 6-month investment that you have for new hires, that you will see that growth on the direct-to-consumer side associated with us increasing that sales capacity. Because as you know, our limit to growth in creating additional consumer awareness is really tied to how much sales capacity we have. So as we add that additional sales capacity, we spend more in marketing to drive more leads to fill that sales capacity. And that's our plan going forward as well. And we do plan to continue to add reps going into 2018 as well *as we still think we're a long way from full saturation on the direct-to-consumer sales side of the business*.

(Emphasis added).

### March 27, 2018 Proxy Statement

133. The Company filed its 2018 Proxy Statement with the SEC on March 27, 2018. Defendants Anderson-Ray, Beardsley, Greer, Huggenberger, Lukatch, McFarland,

Rider, and Wilkinson solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[1]

134.   The 2018 Proxy Statement briefly discussed the Code of Conduct, stating in relevant part:

> Our Board has adopted Corporate Governance Principles. These principles address items such as the qualifications and responsibilities of our directors and director candidates and corporate governance policies and standards applicable to us in general. In addition, our Board has adopted a Code of Ethics and Conduct that applies to all of our employees, officers and directors, including our Chief Executive Officer, Chief Financial Officer, and other executive and senior financial officers… We intend to post any amendments to our Code of Ethics and Conduct, and any waivers of our Code of Ethics and Conduct for directors and executive officers, on the same website.

135.   As of October 4, 2019, there were no waivers of the Code of Conduct for directors or officers on Inogen's website.[2]

136.   The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by seven of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

137.   The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including cash and equity awards designed to: "align the interests of our executive officers with both short-term and long-term stockholders'

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

[2] http://investor.inogen.com/govdocs. Last visited October 4, 2019.

interests" while failing to disclose that the Inogen's share price was artificially inflated as a result of false and misleading statements alleged herein.

138.   The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company was exaggerating the scope of its TAM for its oxygen concentrators; (2) Inogen inaccurately reported the basis for its TAM and business-to-business sales determinations; (3) the Company misattributed its sales success to the skill of its salesforce, when the true reason lay in dishonest sales techniques used to manipulate customers to pay Inogen's higher prices; (4) Inogen reported exaggerated, unmaintainable growth in business-to-business domestic sales to HME suppliers, failing to disclose that such growth harmed its direct-to-consumer sales growth; (5) the Company overstated the proportion of its sales that were attributable to Medicare's steadier market; and (6) Inogen failed to maintain internal controls. As a result of the foregoing, Inogen's public statements were materially false and misleading at all relevant times.

### April 30, 2018 10-Q, Press Release, and Conference Call

139.   On April 30, 2018, Inogen filed its quarterly report with the SEC for the period ended March 31, 2018 on a Form 10-Q (the "1Q18"), in which the Company incorporated by reference the 2017 10-K's business overview. This section reiterated that:

> Portable oxygen concentrators represented the fastest-growing segment of the Medicare oxygen therapy market between 2012 and 2016. The Company estimates based on 2016 Medicare data that the number of patients using portable oxygen concentrators represents approximately 9.1% of the total addressable oxygen market in the United States, although the Medicare data does not account for private insurance and cash-pay patients in the market.

140.   Attached to the 1Q18 were SOX certifications signed by Defendants Wilkinson and Bauerlein, attesting to the accuracy of the 1Q18.

141.   The press release, issued the same day, also announced the Company's financial results for the prior quarter, but focused on even more confident predictions for the fiscal year 2018. Inogen's 1Q18 revenues, for example, had increased a 'record' "50.6% over the same period in 2017" to reach $79.1 million, with the same period seeing an 81.4% increase in net income in the same period, reaching $10.8 million. The Company correspondingly "increas[ed] its full year 2018 total revenue guidance range to $310 to $320 million, up from $298 to $308 million, representing growth of 24.3% to 28.3% versus 2017 full year results." Additionally, Inogen "increas[ed] its full year 2018 GAAP net income and non-GAAP net income guidance range to $38 to $41 million, up from $36 to $39 million, representing growth of 80.9% to 95.2% compared to 2017 GAAP net income of $21.0 million and growth of 33.0% to 43.5% compared to 2017 non-GAAP net income of $28.6 million," and also increasing the fiscal year 2018's "Adjusted EBITDA to $62 to $67 million, up from $60 to $64 million, representing 22.0% to 31.8% growth compared to 2017 results." Finally, much like its report on fiscal year 2017, Inogen repeated that it "continue[d] to expect direct-to-consumer sales to be its fastest growing channel, domestic business-to-business sales to have a solid growth rate, and" that "rental revenue to be down approximately 10% in 2018 compared to 2017 as the Company continues to focus on sales versus rentals."

142.   In relating the individual channels' success to the Company's general financial statements and projections, the press release offered the following:

> Total revenue for the three months ended March 31, 2018 rose 50.6% to $79.1 million from $52.5 million in the same period in 2017. **_Direct-to-consumer sales rose_** 67.8% over the same period in 2017, **_ahead of expectations primarily due to increased sales representative headcount and associated consumer marketing._** Domestic business-to-business sales exceeded expectations and grew 60.4% over the same period in 2017, primarily driven by continued strong demand from the Company's private label partner and traditional home medical equipment providers.

\* \* \*

Inogen is increasing its full year 2018 total revenue guidance range to $310 to $320 million, up from $298 to $308 million, representing growth of 24.3% to 28.3% versus 2017 full year results. ***The Company continues to expect direct-to-consumer sales to be its fastest growing channel, [and] domestic business-to-business sales to have a solid growth rate***...

(Emphasis added).

143.   Defendant Wilkinson, quoted in the press release, again attributed Inogen's performance to a strong market and skilled sales force, stating, in relevant part:

In what is historically a seasonally slower quarter, we were able to generate record revenues driven by strong sales in both our domestic direct-to-consumer and domestic business-to-business channels... We are executing on our strategic initiatives and remain focused on increasing adoption of our best-in-class oxygen product offerings across all of our sales channels. We are currently ahead of schedule to meet our plan of hiring 240 Cleveland-based employees by 2020. We believe we should see strong sales growth in 2018 as portable oxygen concentrator penetration increases worldwide.

144.   A conference call was also held on April 30, 2018, in which Defendant Wilkinson, addressing Inogen's past and projected growth, outlined the Company's plan as follows:

Our record direct-to-consumer sales of $28.7 million in the first quarter of 2018 exceeded our expectations, primarily due to increased sales representative headcount and associated consumer spending. We're currently ahead of schedule to meet our plan of hiring 240 Cleveland-based employees by 2020, with the majority of those being sales reps. Given our recent success, ***our strategy is to steadily to hire additional sales representatives throughout 2018 and continue to invest in marketing activities to increase consumer awareness as we believe that it's still our most effective means to drive growth of the direct-to-consumer sales***. In fact, we expect to release a new TV commercial to showcase the benefits of our portable oxygen concentrators in the second quarter. Further, we initiated a direct-to-consumer pricing trial in the second quarter of 2018 to ensure our products are optimally priced. We expect to provide an update on this trial on our next earnings call. First quarter of 2018 domestic business-to-business sales of $28 million was a record for us and exceeded

our expectations, primarily due to continued success with our private label partner and traditional home medical equipment providers.

\* \* \*

Looking ahead, *I'm very proud of our Inogen associates and the progress made* in what has historically been a seasonally slower quarter. While we've been engaged in multiple initiatives to fuel future growth, *we've accelerated current growth, especially in the domestic direct-to-consumer and business-to-business sales channels*. I'm very pleased with the increased adoption in these markets with our best-in-class and patient-preferred products.

(Emphasis added).

145.   Defendant Wilkinson went on to discuss the quality of the Company's salesforce, and the impact of the Company's new hires on the Company's financial results, stating:

> *Now on the direct-to-consumer side, the results are driven by our increased hiring.* I mentioned that the hiring in Cleveland is going, I'll say, not according to plan, but ahead of plan. *We found that it's a great market*. We're very pleased with the talent that we're finding there. So it has allowed us to hire. If you were to compare our 3-year plan, we're ahead of that plan, if you look at it on a linear basis. And we hired pretty heavily at the end of last year. Those people are now contributing. As you go into the first quarter, you've got – the very first people we hired actually are seasoned reps or at the end of curve. The people hired at the very end of the year are still relatively new in the first quarter, but they climbed that curve. *So primarily, the results are based on our hiring increase. There's some productivity improvement in there*. But if you looked at the contribution of productivity versus headcount and sales capacity, sales capacity is the bigger driver.

(Emphasis added).

146.   Defendant Bauerlein reiterated the prediction that "direct-to-consumer sales [would] be our fastest-growing channel" also expecting "domestic business-to-business sales to have a significant growth rate." Additionally, when answering about future

business-to-business growth and the interaction of the business-to-business and direct-to-consumer channels, she also referenced the estimated TAM, stating, in relevant part:

> So when you look at that, while certainly B2B has a lower gross margin profile, it also has much lower operating expenses associated with it. So when we look at the market opportunity, we look to capture share both on the B2B side and the direct to consumer side, because we're relatively agnostic on the bottom-line. What we have been doing though is continuing to invest in the B2C side, because we're still very early in the market penetration curve, as Scott said earlier, 9% or so penetration in the last data as of the end of 2016. We still have a long ramp to go to continue to take share, both on the direct-to-consumer side, as well as the business to business side away from the tank-based business model.

> So our focus really is to make sure that we maintain a market leadership position, and that we continue to grow the market both on direct-to-consumer side and the B2B side and not to drive a specific mix in our business. Now, inherent in guidance in 2018 is that direct-to-consumer sales would be the fastest growing channel. So that would actually be a tailwind to gross margin expansion over the course of the year.

147.    Inogen's stock price again increased on these announcements, surging from a close of $140.58 per share on April 30, 2018 to a close of $173.17 per share on May 1, 2018.

### August 7, 2018 10-Q, Press Release, and Conference Call

148.    On August 7, 2018, the Company filed its quarterly report with the SEC for the period ended June 30, 2018 on a Form 10-Q (the "2Q18").

149.    The 2Q18 incorporated by reference the 2017 10-K's overview of the portable oxygen market, stating, in relevant part:

> Portable oxygen concentrators represented the fastest-growing segment of the Medicare oxygen therapy market between 2012 and 2016. The Company estimates based on 2016 Medicare data that the number of patients using portable oxygen concentrators represents approximately 9.1% of the total addressable oxygen market in the United States, although the Medicare data does not account for private insurance and cash-pay patients in the market.

Based on 2016 industry data, the Company believes it was the leading worldwide manufacturer of portable oxygen concentrators.

150.   Attached to the 2Q18 were SOX certifications signed by Defendants Wilkinson and Bauerlein, attesting to the accuracy of the 2Q18.

151.   The press release issued the same day announced the "record" performance in the second quarter of 2018 and increased the projections yet again for Inogen's total revenue, GAAP and non-GAAP net income, and Adjusted EBITDA for the fiscal year 2018. For the second quarter of 2018, revenue increased to $97.2 million, "51.6% over the same period in 2017" and net income increased to $14.6 million, representing a jump of 75.2% in the same time frame. Due largely to these favorable results, the Company "increas[ed] its full year 2018 total revenue guidance range to $340 to $350 million, up from $310 to $320 million, representing growth of 36.3% to 40.3% versus 2017 full year results." It went on to "increas[e] its full year 2018 GAAP net income and non-GAAP net income guidance range to $45 to $48 million, up from $38 to $41 million, representing growth of 114.3% to 128.5% compared to 2017 GAAP net income of $21.0 million and growth of 57.5% to 67.9% compared to 2017 non-GAAP net income of $28.6 million," with fiscal year 2018's "Adjusted EBITDA to $65 to $69 million, up from $62 to $67 million, representing 27.9% to 35.7% growth compared to 2017 results." More generally, Inogen still anticipated that "direct-to-consumer sales [would] be its fastest growing channel, domestic business-to-business sales to have a significant growth rate, and international business-to-business sales to have a solid growth rate," with "rental revenue [] down approximately 10% in 2018 compared to 2017 as the Company continue[d] to focus on sales."

152.   As support for these projections, Defendant Wilkinson again touted the skill of Inogen's salesforce, stating, in pertinent part:

> The second quarter of 2018 was a notably strong quarter for us as we generated record revenue across all three sales channels, while also reporting record operating income... ***We are continuing to execute on our strategy to hire additional sales representatives and invest in advertising activities to***

*increase consumer awareness as we believe this is still our most effective means to drive high revenue growth* and portable oxygen concentrator adoption.

(Emphasis added).

153.   Inogen also held a conference call on August 7, 2018, during which the theme of the Company's skilled sales force was repeated by Defendant Wilkinson:

> Looking ahead, *I'm very proud of our Inogen associates and the progress made thus far* in 2018. While we've been engaged in multiple initiatives to fuel future growth, *we've accelerated our current growth, especially in the domestic direct-to-consumer and business-to-business sales channels*. I'm very pleased with the increased adoption in these markets with our best-in-class and patient preferred products.

(Emphasis added).

154.   In response to an analyst's question regarding "the sustainability of business-to-business," Defendant Wilkinson participated in the following dialogue:

> [Analyst]: I was hoping you could talk about the sustainability of business-to-business. This is one that can be lumpy, but it does look like it's really moving in the direction of full adoption here. So I think what people would really like to better understand is, what inning are we in, in terms of adoption from the larger players, the middle sized and the smaller players? And how sustainable is it in the near term? And what could be [rallied] here in your opinion?
>
> [Wilkinson]: Yes.  It's – I just mentioned in the previous question that I think in the what inning we're in [sic], second inning, maybe third inning, but certainly, we're in the first third of the game, if you will.

155.   Inogen's stock price increased in response to these announcements and remarks, with an increase of $16.82 per share from $213.26 at close on August 7, 2018 to close at $230.08 on August 8, 2018. Following these developments, the Company's stock then went on to increase in value, reaching its apex during the Relevant Period on September 14, 2018, at over $282 per share.

### *September 2018 Morgan Stanley Healthcare Conference*

156.   On September 12, 2018, Defendants Wilkinson and Bauerlein attended the annual Morgan Stanley Healthcare Conference. At the conference, a Morgan Stanley analyst asked Defendant Wilkinson, "[s]o one of the things that kind of – one of the pushes you made is to drive a direct-to-consumer sales strategy and move away from the rental market. Now what's the thought process there? How's that beneficial?"

157.   In response, Defendant Wilkinson stated the following:

> Now as Jay said, over the last several years, we've shifted our focus from a rental business more to a retail business.  This really cuts out a lot of the red tape of the Medicare program.  It also – when you look at the reimbursement cuts that have been absorbed by Medicare, the retail sale is more compelling compared to rentals than they once were when the reimbursement was much higher.  So we've shifted our intake criteria and focus.  You have many patients that, when they call in, they've got a life-changing event where they're going to a wedding or the birth of a grandchild.  And so sometimes to go through the red tape of Medicare can be a cumbersome and lengthy process.  So there is a big retail opportunity, life-changing products.  People, we've proven, will definitely spend their own money to gain back their freedom and independence that they once had before their own oxygen.  So because of those dynamics, we've kind of shifted away from rental.  Although, we still have rentals in our business, it's still on our P&L, but our primary focus has been on the retail side over the last several years.  ***That's what's really driven the growth of our business.***

(Emphasis added).

158.   Also at the conference, Defendant Bauerlein discussed the quality of the Company's salesforce with analysts, stating:

> So as you said, we've substantially increased what we think we're going to do in the Cleveland facility, both in terms of sales reps as well as support personnel. And we started – we actually opened the facility about a year ago, last August.  So we've had now about 12 months experience of hiring and training people in that facility.  And we've seen a great quality of reps and a great response to us wanting to enter the market and offer jobs there and that really is what's allowed us to say that we think we've been able to hire there and those people have come up the curve and produced what we wanted and

obviously, you see that in our results. ***And so because of that, we think that because the market penetration is still so small, it's important to capitalize on these market opportunities, particularly in the direct-to-consumer space***. So because of that, we're looking to expand that sales force more. And we put a target out there that is based on our comfort level that we think that, that's an achievable goal by year-end 2020.

(Emphasis added).

159.   The statements in ¶¶ 112–120, 122–132, 139–146, 148–154, and 156–158 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company was exaggerating the scope of its TAM for its oxygen concentrators; (2) Inogen inaccurately reported the basis for its TAM determinations; (3) the Company misattributed its sales success to the skill of its salesforce, when the true reason lay in dishonest sales techniques used to manipulate customers to pay Inogen's higher prices; (4) Inogen reported exaggerated, unmaintainable growth in business-to-business domestic sales to HME suppliers, failing to disclose that such growth harmed its direct-to-consumer sales growth; (5) the Company overstated the proportion of its sales that were attributable to Medicare's steadier market; and (6) Inogen failed to maintain internal controls. As a result of the foregoing, Inogen's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge as False and Misleading Statements Continue

#### November 6, 2018 10-Q, Press Release, and Conference Call

160.   On November 6, 2018, Inogen filed its quarterly report with the SEC for the period ended September 30, 2018 on a Form 10-Q ("3Q18").

161.   Largely reiterating the 2017 10-K in describing the broad strokes of the Company's business, the 3Q18 offered updated statistics, stating, in relevant part:

Portable oxygen concentrators represented the fastest-growing segment of the Medicare oxygen therapy market between 2012 and 2017. ***The Company***

*estimates based on 2017 Medicare data that the number of patients using portable oxygen concentrators represents approximately 10.8% of the total addressable oxygen market in the United States*, although the Medicare data does not account for private insurance and cash-pay patients in the market.

(Emphasis added).

162. Attached to the 3Q18 were SOX certifications signed by Defendants Wilkinson and Bauerlein, attesting to the accuracy of the 3Q18.

163. Inogen also issued a press release on the same day, disclosing a "[t]otal revenue of $95.3 million, up 38.0% over the same period in 2017" as well as a "net income of $16.4 million, reflecting a 123.9% increase over the same period in 2017." Defendant Wilkinson was once again quoted, describing the preceding quarter as "another successful [one] for [the Company,] as [it] generated strong revenue across all three sales channels," adding that it was "continuing to execute on [its] strategy to hire additional sales representatives and invest in advertising activities to increase consumer awareness as [it] believe[d] this [was] still [the] most effective means to drive high revenue growth and portable oxygen concentrator adoption."

164. Turning to its fiscal year 2018 predictions, Inogen deviated from its prior pattern of steadily increasing its expectations. This time the Company "narrow[ed]" its fiscal year 2018 net income guidance, stating it would come in at a range of "$46 to $48 million," from its $45 to $48 million target announce in the 2Q18. As before, however, Inogen still "expect[ed] direct-to-consumer sales to be its fastest growing channel," with "domestic business-to-business sales [still] hav[ing] a significant growth rate," and finally "international business-to-business sales [also still] hav[ing] a solid growth rate."

165. Finally, Inogen held a conference call with analysts and investors later on November 6, 2018. Defendant Wilkinson once more ascribed the Company's impressive direct-to-consumer sales to its skilled sales force stating, in relevant part:

Looking ahead to 2019, we expect to remain a high growth company and to continue to invest heavily in our sales force, advertising efforts and operations in order to drive portable oxygen concentrator adoption worldwide. We also expect to open new international markets such as China by year-end 2020, and we plan to continue to invest in regulatory approval and business infrastructure in 2019 to support this initiative.

166.    During the conference call, a Needham analyst questioned Defendant Wilkinson about market saturation, asking, "are you seeing any kind of signs of saturation of this pool of patients that are at least willing to buy out-of-pocket?" In response, Defendant Wilkinson stated,

Yes. I mean, we do monitor all of those metrics. And I mean, obviously, we're confident when we're making these investments that we're not at a point where you're at saturation. And certainly, the Medicare numbers bear that out. Our other metrics bear that out. Otherwise, we wouldn't make such an investment.

167.    Also during the conference call, Defendant Bauerlein discussed the Company's lowered income guidance, stating, in relevant part:

So the level of investment, clearly, was higher than we had thought on the second quarter call, because of the ramp that we've seen on the sales reps and the number of people we have in the facility, and then the related media spend. So that has come in ahead of what we expected on the second quarter call, which of course, leads to higher expenses in the near term. But we think that that's the right decision. So while we did lower adjusted EBITDA, it's really for those sales and marketing expenses. So we expect those sales and marketing expenses to also be higher in the fourth quarter, and they also were higher in the third quarter as well. So those 2 items combined really account for the changes that we're seeing in adjusted EBITDA.

168.    Defendant Bauerlein further attributed the Company's slowed growth to the Company's traditionally "tougher" fourth quarter sales, stating:

So when we look at the Q4 expectation, obviously, it does assume a deceleration there of the growth rate. Now remember, Q4, also last year,

was strong for us on the direct-to-consumer side, against the typical seasonality where we see, typically, the stronger months are actually Q2 and then followed by Q3. So the comps get tougher on the direct-to-consumer side going into Q4 because of that. So I want to make sure people understand that. Obviously, as we've continued to hire, that also helps offset that.

169. In spite of favorable projections and sales reports, Inogen's stock price fell significantly upon news of reduced growth projections. The Company anticipated a sizeable drop off in business-to-business sales growth for 2Q18 (from 56% to 32%) and lowered EBITDA projections from $65-$69 million to $60-$62 for the fiscal year 2018.

170. After the 3Q18 announced these results, Inogen's common stock price dropped by $37.44 per share (over 19%), from a close of $193.30 on November 6, 2018 to close at $155.86 on November 7, 2018, on an extremely high volume of 2.64 million shares traded.

### *January 2019 J.P. Morgan Healthcare Conference*

171. On January 9, 2019, Defendants Wilkinson and Bauerlein attended the annual J.P. Morgan Healthcare conference, where they continued to make false and misleading statements regarding the scope of the Company's TAM and its market penetration. With respect to the Company's TAM, Defendant Wilkinson stated, "we've seen some people actually make some errors in market assessment because they don't fully understand the data."

172. With respect to the market penetration of the Company's portable oxygen concentrators, Defendant Wilkinson stated the following:

Now in the U.S., the penetration of POCs, it's still really in its infant stages despite the compelling benefits for a patient, giving them freedom and mobility as well as the low total cost service. The penetration in 2017, and that's the latest Medicare data available, is 2017, was about 11%. And you can kind of see at the bottom of the screen how that's progressed over the last several years. From '14 through '17, we've gone 7%, 8%, 9%, 11%. So POCs are actually the fastest-growing modality within oxygen therapy. But the market is still largely underpenetrated. Our estimate is that over time,

that POCs or portable oxygen concentrators will replace the tanks. And essentially, we've said, "90% of the patients that are ambulatory would be given a POC. If you assume that, believe that assumption, then it's 90% of the 73% ambulatory patients which means that at the end of the day, full penetration would be 65%." So again, we're a long way from the end of curve that's why we're bullish on continued investment in expanding our sales force.

173. Moreover, during the conference, the Company provided a slide presentation, which stated that an estimated 30 million Americans were currently living with COPD. This estimate was based on an out-of-date 1988–1994 study conducted by the Center for Disease Control (the "CDC"), in which the CDC concluded that half of Americans living with COPD were unaware that they had COPD. The 30 million figure provided by the Company was in fact double the CDC's current count of 15 million Americans living with COPD.

### *Muddy Waters and Citron Reports*

174. On February 8, 2019, Muddy Waters Research released a detailed report disputing the reported 2.5 to 3 million TAM that Inogen had previously claimed. The report's core claim was that the Company's TAM was only 1.3 million instead of the estimated 2.5-3.0 million, and that the latter figure was based on flagrantly unreliable research from WinterGreen Research, Inc.

175. The means of arriving at the TAM and growth projections touted by Inogen involved, in some cases, "three layers of numerical manipulation," by selectively ignoring sources of data, cherry-picking Medicare statistics, and ignoring the interaction of its own two sales channels. Specifically, Inogen's and WinterGreen's projections accounted for neither the portion of ambulatory oxygen patients who are not candidates for portable oxygen concentrators, nor the 3-year Medicare cap on oxygen devices. These factors led Muddy Waters to predict that, contrary to Inogen's projected 7-10% annual growth, the Company would reach its sales "peak no later than next year."

176. The Muddy Waters report went on to characterize Inogen as a prime example of "much of what is dysfunctional about today's capital markets: Misleading statements by management, shoddy market research presented as authoritative, thorough sell-side capture, and of course significant enrichment of insiders through stock sales." This assessment led Muddy Waters to target the stock at only $46, compared to the opening price of $138.57 per share on the date that the report was published.

177. Following the Muddy Waters report, Inogen's stock price fell approximately $3.00 per share, from a close of $139.74 on February 7, 2019 to close at $136.72 on February 8, 2019, on a high volume of over 2 million shares traded.

178. Citron Research followed with its own report on February 12, 2019, exposing Inogen's "dirty" systems of reselling and its practice of taking advantage of its aging customers through deception. The report revealed that the Company's highest reseller was a recently released felon, convicted on deceptive internet marketing charges. According to Citron, it was through this reseller and others that Inogen apparently schemed to take over Google's ad listings. Finally, Citron described Inogen's practice of lying to patients by telling them that their Medicare would cover Inogen's oxygen concentrators, but not the (more competitively priced) competing providers' products. The grievances from defrauded customers were drawn from the Better Business Bureau's website.

179. Citron's report, like Muddy Waters', went on to value Inogen's stock at only $46, due to both its low percentage of revenue from Medicare (under 10%) and its falsely inflated direct-to-consumer sales that resulted from the fraud described above.

180. After the Citron report, Inogen's stock price, which had begun to rebound, dropped by over $4.00 per share, from a February 11, 2019 close of $142.09 per share to close on February 12, 2019 at $138.05 per share.

***February 26, 2019 10-K, Press Release, and Conference Call***

181.   After the market closed on February 26, 2019, Inogen filed its annual report on a Form 10-K with the SEC and issued a press release publishing its financial results for the fourth quarter and fiscal year ended December 31, 2018, as well as its projections for the fiscal year 2019. It reported a decrease of 9.5% year-over-year in non-GAAP EBITDA for the fourth quarter of 2018, with predictions that "rental revenue [would] grow modestly in 2019 compared to 2018, despite the additional 3.9% decline in portable oxygen concentrator Medicare reimbursement rates effective January 1, 2019 . . ." Also in its fiscal year 2019 projections, Inogen lowered its anticipated net income from $48-$50 million to $40-$44 million, citing "an estimated decrease in excess tax benefits recognized from stock-based compensation from $12 million to $4 million, due to the Company's current stock price and fewer expected option exercises in 2019."

182.   Defendant Wilkinson also held a conference call on February 26, 2019, during which he reversed Inogen's previous TAM estimate of 2.5-3 million, stating:

> [W]e've looked at it a few different ways. We keep landing in that same area. I will emphasize that we've always said 2.5 million to 3 million, we haven't said 3.0 million or anything, it's kind of an acknowledgment that it's an estimate, it's probably a tougher estimate now than it used to be because of the movement within the data sources. But I think, the key is it's not 20 million, it's not 500,000. We feel very good about that estimate, no change to that.

183.   Undeterred by the revelations of the Muddy Waters and Citron reports, Defendant Wilkinson continued to make material misrepresentations about the Company during the conference call, stating, in relevant part:

> [R]educed reimbursement rates as a result of competitive bidding, enhanced ***Medicare coverage and billing requirements and other factors have created access issues and caused the cash pay market***, which is not reflected in the Medicare data, to grow substantially for both new and existing patients.
>
> Lastly, we are an accredited home care provider, licensed to provide respiratory products in all 50 states, heavily regulated by Medicare and the

> FDA *and subject to frequent audits to maintain these accreditations and licenses and we take compliance with the law seriously*.
>
> Specifically, we have compliance requirements in place for our authorized Internet resellers.  And without commenting on any specific Internet resellers, we expect that our Internet resellers abide by all applicable laws and regulations.
>
> While some patients would rather receive products using their insurance benefits, the reimbursement dynamics in oxygen therapy have led some patients to seek better options, even if it means paying out of pocket. We are proud that we and our customers can make a difference in these patient's lives.

(Emphasis added).

184.   Following these disclosures, the Company's price per share dropped further (over 24%) from a closing price of $140.06 on February 26, 2019 to close at $106.28 on February 27, 2019, on an extremely high trading volume of 3.64 million shares traded.

### March 26, 2019 Proxy Statement

185.   The Company filed its 2019 Proxy Statement with the SEC on March 26, 2019. Defendants Anderson-Ray, Beardsley, Greer, Huggenberger, Lukatch, McFarland, Rider, and Wilkinson solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

186.   The 2019 Proxy Statement briefly discussed the Code of Conduct, stating in relevant part:

> Our Board has adopted Corporate Governance Principles.  These principles address items such as the qualifications and responsibilities of our directors and director candidates and corporate governance policies and standards applicable to us in general. In addition, our Board has adopted a Code of Ethics and Conduct that applies to all of our employees, officers and

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

directors, including our Chief Executive Officer, Chief Financial Officer, and other executive and senior financial officers… We intend to post any amendments to our Code of Ethics and Conduct, and any waivers of our Code of Ethics and Conduct for directors and executive officers, on the same website.

187. As of October 4, 2019, there were no waivers of the Code of Conduct for directors or officers on Inogen's website.[4]

188. The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by seven of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

189. The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including cash and equity awards designed to: "align the interests of our executive officers with both short-term and long-term stockholders' interests" while failing to disclose that the Inogen's share price was artificially inflated as a result of false and misleading statements alleged herein.

190. The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company was exaggerating the scope of its TAM for its oxygen concentrators; (2) Inogen inaccurately reported the basis for its TAM and business-to-business sales determinations; (3) the Company misattributed its sales success to the skill of its salesforce, when the true reason lay in dishonest sales techniques used to manipulate customers to pay Inogen's higher prices; (4) Inogen reported exaggerated, unmaintainable growth in business-to-business domestic sales to HME suppliers, failing to disclose that such growth harmed its direct-to-consumer sales growth; (5) the Company overstated the proportion of its sales that were attributable to Medicare's

---

[4] http://investor.inogen.com/govdocs. Last visited October 4, 2019.

steadier market; and (6) Inogen failed to maintain internal controls. As a result of the foregoing, Inogen's public statements were materially false and misleading at all relevant times.

191.   The statements in ¶¶ 160–168, 171–173, and 181–183 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company was exaggerating the scope of its TAM for its oxygen concentrators; (2) Inogen inaccurately reported the basis for its TAM determinations; (3) the Company misattributed its sales success to the skill of its salesforce, when the true reason lay in dishonest sales techniques used to manipulate customers to pay Inogen's higher prices; (4) Inogen reported exaggerated, unmaintainable growth in business-to-business domestic sales to HME suppliers, failing to disclose that such growth harmed its direct-to-consumer sales growth; (5) the Company overstated the proportion of its sales that were attributable to Medicare's steadier market; and (6) Inogen failed to maintain internal controls. As a result of the foregoing, Inogen's public statements were materially false and misleading at all relevant times.

## **The Truth Fully Emerges**

192.   On May 7, 2018, the Company issued a press release announcing its financial results for the first fiscal quarter of 2019, ended March 31, 2019. In the press release, Defendant Wilkinson disclosed that the Company's business-to-business sales continued to falter, and that the Company's shift away from the Medicare market was slowing the Company's growth, stating:

> ***The first quarter of 2019 was a tough quarter for us given the decline in domestic business-to-business sales*** and the increased direct-to-consumer sales and marketing expenditures. . . .   We believe there is still a large opportunity for portable oxygen concentrator adoption worldwide; however, ***there are patient access issues given the current reimbursement environment and the restructuring challenges that some providers are***

*facing in converting their oxygen business to a non-delivery model*.  As a result, we are focused on multiple initiatives to drive sales and marketing efficiencies and build a more predictable revenue stream over time.

(Emphasis added).

193.   The press release further disclosed that the Company was reducing its total revenue guidance for 2019 in light of its slowed growth, stating:

> Inogen is reducing its full year 2019 total revenue guidance to $405 to $415 million, down from $430 to $440 million, representing growth of 13.1% to 15.9% versus 2018 full year results.  While the Company still expects direct-to-consumer sales to be its fastest growing channel, it plans to slow the pace of hiring in 2019 and place more emphasis on sales representative productivity.  Inogen still expects international business-to-business sales to have a solid growth rate, but now expects domestic business-to-business sales to have a slightly negative growth rate.  Given the difficult growth comparisons Inogen faces in the domestic business-to-business channel, the restructuring challenges of some providers, and its rental plan, it expects negative growth in the domestic business-to-business channel in the second quarter of 2019 compared to the second quarter of 2018, with modest growth in the back half of 2019 compared to the back half of 2018.

194.   That same day, the Company held a conference call to discuss its financial results. During the call, Defendant Wilkinson at last revealed that the Company's more recent additions to its salesforce were not effective as previous hires, contradicting the Company's prior representations, stating:

> Looking at the first quarter of 2019, we generated total revenue of $90.2 million, reflecting growth of 14.1% over the first quarter of 2018.
>
> Direct-to-consumer sales of $39 million in the first quarter of 2019 increased 35.9% over the first quarter of 2018 primarily due to increased sales representative headcount and associated consumer advertising.  *However, the sales reps we hired in the second half of 2018, on average, took longer to come up the productivity curve than our historical target and were not at their full potential in the first quarter.*

> ***Moving forward, we plan to slow down the addition of new sales
> representative hires*** and focus on improving the productivity of our sales
> team.  Over the last 2 quarters, we have also applied with it a separate rental
> team that will focus exclusively on new rental additions to drive overall
> sales productivity.  And we plan to roll this out across our entire group in the
> coming quarters.
>
> As we've continued to grow our sales staff and the associated number of
> required leads has grown, we have seen the cost per generated lead trend
> higher than historical averages.   We believe we will see increased
> productivity of our sales reps throughout 2019, which should reduce our
> overall cost per sale despite expected increased marketing spend.
>
> First quarter 2019 domestic business-to-business sales of $26.1 million
> decreased 7% from the first quarter of 2018 primarily due to a decline in
> sales to our private label partner.  These sales declines were a partner due to
> one large national home care provider who significantly reduced orders in
> the first quarter of 2019 as compared to the same period in 2018.
>
> Specifically, this provider who we discussed in our last earnings call
> accounted for revenue of $700,000 in the first quarter of 2019, down from
> $9.3 million in the first quarter of 2018.

(Emphasis added).

195.   Defendant Wilkinson went on to attribute the salesforce's decline in
performance to inadequate training and support from the Company's Cleveland office,
further contradicting his earlier representations, stating:

> Let me back up to probably the first half of '18 is kind of a benchmark.  We
> started to hire at a heavier rate than historical in the first half of the year.
> And things, I'll say, that even exceeded our expectations.  As we continued
> and actually cranked up hiring to an even higher rate as we went into the
> third quarter, that's where things didn't meet our expectations.  And as I said
> in my prepared remarks, when we look at productivity of reps, they no
> longer were matching what we have seen from a historical productivity
> standpoint.  We got a little bit ahead of ourselves on management.  I think
> we mentioned that in the previous call that we had to shore up our
> management ***but we found that we still need to invest in further training on
> management so that there are even better resource for the new reps that***

*we have.  **If you look at most of the incremental hiring is in our Cleveland facility.  That's where we have space.  So that's why most of the hiring is there.  But the folks are not surrounded by 5-year veteran reps there**.*  It's a relatively new facility.  So we need to make an even bigger investment into training and support of those new reps to drive that productivity.

(Emphasis added).

196.   On this news, the price of the Company's stock plunged yet again, from $91.14 per share at the close of trading on May 7, 2019, to $67.79 at the close of trading on May 8, 2019, a drop of more than 25%.

197.   That same day, the Motley Fool posted an article commenting on the stock drop, titled, "Why Inogen Shares are Plunging Today." In relevant part, the article stated, "[t]he mixed quarterly results weren't great, but the huge contraction in the share price appears to be related to management's full year guidance updates."

## **DAMAGES TO INOGEN**

198.   As a direct and proximate result of the Individual Defendants' conduct, Inogen has lost and expended, and will lose and expend, many millions of dollars.

199.   Such expenditures include, but are not limited to, legal fees associated with two Securities Class Action filed against the Company, its CEO, and its CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

200.   Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

201.   As a direct and proximate result of the Individual Defendants' conduct, Inogen has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the

Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

202.   Plaintiff brings this action derivatively and for the benefit of Inogen to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Inogen, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

203.   Inogen is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

204.   Plaintiff is, and has continuously been at all relevant times, a shareholder of Inogen. Plaintiff will adequately and fairly represent the interests of Inogen in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

205.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

206.   A pre-suit demand on the Board of Inogen is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight Individual Defendants: Wilkinson, Anderson-Ray, Beardsley, Greer, Huggenberger, Lukatch, McFarland, and Rider (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time this action was commenced.

207.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while six of them

engaged in insider sales based on material non-public information, netting proceeds of over $33.3 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

208.   In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

209.   Additional reasons that demand on Defendant Wilkinson is futile follow. Defendant Wilkinson has served as the Company's CEO and director since January 1, 2017. He previously served as COO and President from January 2016 to February 2017. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Wilkinson with his principal occupation, and he receives handsome compensation, including $2,687,338 during fiscal year 2018. Defendant Wilkinson was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the 2017 10-K, which he signed and signed SOX certifications for. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales before the fraud was exposed, which yielded approximately $8.5 million in proceeds, demonstrate his motive in facilitating and participating in the fraud.

210.   Furthermore, Defendant Wilkinson is a defendant in the Securities Class Action. For this reason, too, Defendant Wilkinson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

211.   Additional reasons that demand on Defendant Anderson-Ray is futile follow. Defendant Anderson-Ray has served as a Company director since 2013, and he is a member of the Audit Committee. The Company provides Defendant Anderson-Ray with handsome compensation, including $233,238 during fiscal year 2018. As a trusted Company officer, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Anderson-Ray signed, and thus personally made, the false and misleading statements in the 2017 10-K. His insider sales before the fraud was exposed, which yielded approximately $689,000 in proceeds, demonstrate his motive in facilitating and participating in the fraud.

212.   Additional reasons that demand on Defendant Beardsley is futile follow. Defendant Beardsley has served as a Company director since January 1, 2017 and serves as a member of the Compensation, Nominating, and Governance Committee. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Beardsley also signed, and thus personally made the false and misleading statements in the 2017 10-K. For these reasons, Defendant Beardsley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

213. Additional reasons that demand on Defendant Greer is futile follow. Defendant Greer has served as a Company director since August 2015 and serves as the Chairperson of the Audit Committee. Defendant Greer receives handsome compensation, including $240,738 during fiscal year 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Greer signed, and thus personally made the false and misleading statements in, the 2017 10-K. For these reasons, too, Defendant Greer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

214. Additional reasons that demand on Defendant Huggenberger is futile follow. Defendant Huggenberger has served as a Company director since 2018 and previously served as Inogen's President from January 1, 2008 to January 1, 2016 and as its CEO from January 1, 2008 to January 1, 2017. Defendant Huggenberger receives handsome compensation, including $223,738 during fiscal year 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Huggenberger signed, and thus personally made the false and misleading statements in, the 2017 10-K. His insider sales before the fraud was exposed, which yielded over $19.8 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Huggenberger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

215.   Additional reasons that demand on Defendant Lukatch is futile follow. Defendant Lukatch has served as a Company director since 2006 and as its Chairman of the Board since 2008. He is also a member of the Compensation, Nominating and Governance Committee. Defendant Lukatch receives handsome compensation, including $296,238 during fiscal year 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Lukatch signed, and thus personally made the false and misleading statements in, the 2017 10-K. His insider sales before the fraud was exposed, which yielded over $1.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Lukatch breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

216.   Additional reasons that demand on Defendant McFarland is futile follow. Defendant McFarland has served as a Company director since 2013 and is a member of the Audit Committee. Defendant McFarland receives handsome compensation, including $236,238 during fiscal year 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McFarland signed, and thus personally made the false and misleading statements in, the 2017 10-K. His insider sales before the fraud was exposed, which yielded over $1.4 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant McFarland breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

217.   Additional reasons that demand on Defendant Rider is futile follow. Defendant Rider has served as a Company director since 2014 and is the Chairperson of the Compensation, Nominating, and Governance Committee. Defendant Rider receives handsome compensation, including $240,238 during the fiscal year 2018. As a Company director she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Rider signed, and thus personally made the false and misleading statements in, the 2017 10-K. Her insider sales before the fraud was exposed, which yielded over $1.4 million in proceeds, demonstrate her motive in facilitating and participating in the fraud. For these reasons, too, Defendant Rider breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

218.   Additional reasons that demand on the Board is futile follow.

219.   As described above, six of the Directors on the Board directly engaged in insider trading, in violation of federal law. Defendants Wilkinson, Anderson-Ray, Huggenberger, Lukatch, McFarland, and Rider collectively received proceeds of over $33.3 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and thus excused.

220.   Demand in this case is excused because the Directors control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendant Beardsley is a Managing Partner at Novo Ventures (US), a subsidiary of Novo Holdings A/S, which owns more Inogen stock (16.73%) than any

other company or individual. Though Inogen does not consider Defendant Beardsley "to be a beneficial owner of, nor [have] a reportable pecuniary interest in, the shares held by Novo Holdings A/S," it is unlikely that the other Directors will subject Defendant Beardsley to a lawsuit for fear of losing Novo's business. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

221.   Defendants Anderson-Ray, McFarland, and Greer (the "Audit Committee Defendants") were members of the Audit Committee during the Relevant Period. According to the Committee's charter, its members are charged with maintaining, *inter alia*: effective internal controls, compliance with relevant laws and rules, and the integrity of Inogen's financial reports. The Audit Committee Defendants failed in all of their above charges by allowing the Company to make material accounting errors and issue false and misleading statements in its SEC filings. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

222.   In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Code of Conduct, the Directors failed to comply with the law. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

223.   Inogen has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt

to recover for Inogen any part of the damages Inogen suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

224.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

225.   The acts complained of herein constitute violations of fiduciary duties owed by Inogen officers and directors, and these acts are incapable of ratification.

226.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Inogen. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Inogen, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

227.   If there is no directors' and officers' liability insurance, then the Directors will not cause Inogen to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

228.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against Individual Defendants for Violations of**

**Section 14(a) of the Exchange Act**

229.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

230.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

231.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

232.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

233.   Under the direction and watch of the Directors, the 2018 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company was exaggerating the scope of its TAM for its oxygen concentrators; (2) Inogen inaccurately reported the basis for its TAM determinations; (3) the Company misattributed its sales success to the skill of its salesforce, when the true reason lay in dishonest sales techniques used to manipulate customers to pay Inogen's higher prices; (4) Inogen reported exaggerated, unmaintainable growth in business-to-business domestic sales to HME suppliers, failing to disclose that such growth harmed its direct-to-consumer sales growth; (5) the Company overstated the proportion of its sales that were attributable to Medicare's steadier market; and (6) Inogen failed to maintain internal controls. As a result of the foregoing, Inogen's public statements were materially false and misleading at all relevant times.

234.   The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements including cash and equity awards designed to: "align the interests of our executive officers with both short-term and long-term stockholders' interests" while failing to disclose that Inogen's share price was artificially inflated as a result of false and misleading statements alleged herein.

235.   The 2018 Proxy Statement also made references to the Code of Conduct. The Code of Conduct required the Company and the Individual Defendants to abide by relevant laws and regulations, make accurate and non-misleading public disclosures, and not engage in insider trading. By engaging issuing false and misleading statements to the

investing public and insider trading, the Individual Defendants violated the Code of Conduct. The 2018 Proxy Statement failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

236.   In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2018 Proxy Statement, including, but not limited to, election of directors, ratification of an independent auditor, and advisory approval of executive compensation.

237.   The false and misleading elements of the 2018 Proxy Statement led to the re-election of Defendants Wilkinson, Anderson-Ray, and McFarland, which allowed them to continue breaching their fiduciary duties to Inogen.

238.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2018 Proxy Statement.

239.   Plaintiff on behalf of Inogen has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

240.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

241.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Inogen's business and affairs.

242.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

243.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as

alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Inogen.

244.   In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

245.   In further breach of their fiduciary duties owed to Inogen, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was exaggerating the scope of its TAM for its oxygen concentrators; (2) Inogen inaccurately reported the basis for its TAM determinations; (3) the Company misattributed its sales success to the skill of its salesforce, when the true reason lay in dishonest sales techniques used to manipulate customers to pay Inogen's higher prices; (4) Inogen reported exaggerated, unmaintainable growth in business-to-business domestic sales to HME suppliers, failing to disclose that such growth harmed its direct-to-consumer sales growth; (5) the Company overstated the proportion of its sales that were attributable to Medicare's steadier market; and (6) Inogen failed to maintain internal controls. As a result of the foregoing, Inogen's public statements were materially false and misleading at all relevant times.

246.   The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

247.   In breach of their fiduciary duties, seven of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

248.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

249.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

250.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

251.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Inogen has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

252.   Plaintiff on behalf of Inogen has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

253.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

254.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Inogen.

255.   The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Inogen that was tied to the performance or artificially inflated valuation of Inogen, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

256.   Plaintiff, as a shareholder and representative of Inogen, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

257.   Plaintiff on behalf of Inogen has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

258.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

259.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (such as the Securities

Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

260.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

261.   Plaintiff on behalf of Inogen has no adequate remedy at law.

## PRAYER FOR RELIEF

262.   FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Inogen, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Inogen;

(c)   Determining and awarding to Inogen the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Inogen and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Inogen and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Inogen to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Inogen restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 7, 2019                Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Laurence M. Rosen
Laurence M. Rosen (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## **VERIFICATION**

I, Haitham Saeed am a plaintiff in the within action. I have reviewed the allegations made in this consolidated shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of ___9/27/2019___, 2019.

DocuSigned by:

*Haitham Saeed*

D72BD801D6E148B...

Haitham Saeed